WALKER MANUFACTURING,
INC., Plaintiff,

v.

HOFFMANN, INC., an Iowa corpora-
tion, Larry Emmert, Marty Sixt, and
J.R. Sales and Machinery, Inc., Defen-
dants.

No. C 00–103–MWB.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

May 12, 2003.

Kevin J. Caster, Mark L. Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiff.

Michael L. Noyes, Lane & Waterman, Davenport, IA, Gregory M. Lederer, Simmons Perrine Albright Ellwood, Michael McDonough, Moyer & Bergman, PLC, Cedar Rapids, IA, for Defendants.

Marty Sixt, Iowa City, IA, Pro se.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT HOFFMANN'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .................................................... 1057
 A. Procedural Background .............................................. 1057
 B. Factual Background .............................................. 1059

II. LEGAL ANALYSIS ...................................................... 1061
 A. Standards For Summary Judgment ...................................... 1061

 B. *De Minimis Conduct* .............................................1062
 1. *Arguments of the parties* ...............................1062
 2. *The de minimis doctrine in copyright and Lanham Act law* ...........1063
 3. *Was Hoffmann's conduct de minimis?* .............................1065
 C. *"Reverse Palming Off"* .........................................1068
 1. *Arguments of the parties* ...............................1068
 2. *Source and nature of the Lanham Act's prohibition* .................1068
 3. *"Copying" as "reverse palming off"* ............................1070
 a. *Cognizability in light of elements of the claim* ..................1070
 b. *Cognizability in light of Pioneer Hi–Bred* .......................1070
 c. *Cognizability in light of Waldman Publishing* ...................1072
 d. *Cognizability in light of Montgomery and Roho* ..................1075
 4. *Conclusion* .........................................1077
 D. *Actual Consumer Confusion* .......................................1077
 1. *Arguments of the parties* ...............................1077
 2. *Analysis* .........................................1077
 E. *Permanent Injunctive Relief* .......................................1078
 F. *Scope Of Misappropriation Of Trade Secrets Claim* ...................1078
 1. *Arguments of the parties* ...............................1078
 2. *Analysis* .........................................1079
 a. *Elements of misappropriation of "trade secrets"* .................1079
 b. *Definition of a "trade secret"* ...............................1079
 c. *"Reverse engineering"* .......................................1080
 d. *Walker's additional trade secrets* ...........................1082
 G. *Money Damages For Misappropriation Of Trade Secrets* ...............1084
 1. *Arguments of the parties* ...............................1084
 2. *Analysis* .........................................1085
 a. *Olson* .........................................1085
 b. *Winston Research Corp* ......................................1087
 c. *Application of cases* .......................................1087

III. **CONCLUSION** ...................................................1088

## I. INTRODUCTION

### A. Procedural Background

Renewing its attempts to whittle away at the plaintiff's various claims of interference with the plaintiff's intellectual property rights related to self-propelled crop sprayers and its business of designing and selling such equipment, the principal defendant in this case has filed its second motion for partial summary judgment. In the present motion, the defendant mounts what it claims are new and different challenges to the plaintiff's copyright, unfair competition, and trade secrets claims. The plaintiff, however, contends that the issues presented by the defendant's second motion for partial summary judgment have already been decided by the court, in its disposition of the defendant's first motion for partial summary judgment, or are subject to genuine issues of material fact that can only be resolved by a trial on the merits.

In this lawsuit, filed June 28, 2000, plaintiff Walker Manufacturing, Inc., originally asserted numerous claims against only one defendant, Hoffmann, Inc., arising from Hoffmann's alleged interference with Walker's intellectual property rights relating to self-propelled crop sprayers and Walker's business of designing and selling such sprayers. By order dated August 11, 2000, and clarified on August 28, 2000, Judge Melloy, who has since been elevated to the Eighth Circuit Court of Appeals, granted Walker's application for a preliminary injunction and enjoined Hoffmann from selling, marketing, or displaying to any third party Hoffmann's self-propelled, high-clearance agricultural sprayer, which allegedly incorporated trade secrets and

intellectual property misappropriated by Hoffmann from Walker.

On November 9, 2000, Walker filed an Amended Complaint adding defendants Larry Emmert, Marty Sixt, and "Jan Rule *dba* J.R. Sales and Advantage Sprayers." Walker filed a Second Amended Complaint on June 27, 2001, identifying the last defendant as "J.R. Sales and Machinery Service, Inc." The Second Amended Complaint is the one presently before the court. Count I of the Second Amended Complaint asserts claims under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962(c), and the Iowa Ongoing Criminal Conduct Act (IOCCA), IOWA CODE § 706A.2(1)(c) against defendants Hoffmann, Emmert, Sixt, and J.R. Sales; Count II alleges "false designation of origin," elsewhere described as "reverse passing off" or "reverse palming off," in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against defendant Hoffmann only; Count III alleges copyright infringement in violation of 17 U.S.C. § 106 against defendant Hoffmann only; Count IV alleges misappropriation of trade secrets in violation of IOWA CODE § 550 against defendants Hoffmann and Sixt; Count V alleges a state-law correlate of the "reverse palming off" claim in Count II, this time identified as "unfair competition," against defendants Hoffmann and J.R. Sales; Count VI alleges breach of contract against defendant Hoffmann; Count VII alleges fraudulent non-disclosure against defendant Hoffmann; Count VIII alleges breach of fiduciary duty against defendant Hoffmann; Count IX alleges interference with prospective business advantage against defendants Hoffmann and J.R. Sales; and Count X alleges breach of a non-competition agreement against defendant Sixt. However, prior to the filing of the Second Amended Complaint, by order dated April 25, 2001, Judge Melloy had already dismissed Count I, the RICO claim, on a motion to dismiss by defendants Hoffmann and Emmert. *See Walker Mfg., Inc. v. Hoffmann, Inc.,* 157 F.Supp.2d 1012 (N.D.Iowa 2001) (*Walker I*).

Hoffmann filed its first motion for partial summary judgment on February 21, 2002, and this court granted that motion in part and denied it in part by order dated September 13, 2002. *See Walker Mfg., Inc. v. Hoffmann, Inc.,* 220 F.Supp.2d 1024 (N.D.Iowa 2002) (*Walker II*). Somewhat more specifically, the court granted summary judgment in favor of the defendants on Walker's prayer for statutory damages or a permanent injunction on Walker's copyright infringement claim in Count III, but otherwise denied summary judgment on Counts II and V (reverse palming off/unfair competition), III (copyright infringement), and VIII (breach of fiduciary duty).

This matter comes before the court pursuant to Hoffmann's *second* Motion For Partial Summary Judgment, filed on January 31, 2003. Hoffman contends that the present motion for partial summary judgment "is not a motion for reconsideration of its previous motion for partial summary judgment," but is instead "based on evidence procured since the filing of the previous motion and presents arguments for partial summary judgment not yet raised." Defendant Hoffmann's Memorandum Supporting [Second] Motion For Partial Summary Judgment, 3 n. 1. The present motion seeks summary judgment in Hoffmann's favor on claims or discrete issues in Counts II and V (reverse palming off/unfair competition), III (copyright infringement), and IV (misappropriation of trade secrets). Walker resisted Hoffmann's second motion for partial summary judgment on February 18, 2003, asserting that at least some of the issues presented by the motion have been previously decided by the court, in its disposition of Hoff-

mann's first motion for partial summary judgment, and that summary judgment is not appropriate on other issues. Hoffmann filed a reply in further support of its second motion for partial summary judgment on February 26, 2003.

On February 27, 2003, defendant J.R. Sales and Machinery Services, Inc., filed a joinder in the portions of Hoffmann's second motion for partial summary judgment pertaining to the "unfair competition" claim in Count V, which is the only count in dispute in Hoffmann's motion that is also brought against J.R. Sales. J.R. Sales did not separately brief its joinder or supplement in any way Hoffmann's appendix, nor did Walker find it necessary to file a separate response to J.R. Sales's joinder.

The parties did not request oral arguments on Hoffmann's second motion for partial summary judgment and the court has likewise concluded that oral arguments are unnecessary. Therefore, Hoffmann's second motion for partial summary judgment is fully submitted on the parties' written submissions.

## B. Factual Background

Whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues of material fact for trial. *See, e.g., Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996). Nevertheless, the court will not attempt here a comprehensive review of the undisputed and disputed facts in the record. Rather, the court will present here only sufficient factual background to put in context the parties' arguments for and against summary judgment on Walker's copyright, reverse palming off/unfair competition, and trade secrets claims or issues pertinent to those claims. More attention will be given to specific factual

disputes, where necessary, in the court's legal analysis.

The court has twice presented the factual background to Walker's claims in rulings on dispositive motions, once in response to a motion to dismiss Count I of Walker's Amended Complaint,[1] *see Walker I*, 157 F.Supp.2d at 1014–15, and once in response to Hoffmann's first motion for partial summary judgment, which, like the present motion, sought judgment in Hoffmann's favor on Walker's reverse palming off/unfair competition and copyright claims (in Counts II, V, and III, respectively), as well as on Walker's breach-of-fiduciary-duty claim (Count VIII), which is not at issue here. *See Walker II*, 220 F.Supp.2d at 1033–35. Therefore, the court need only summarize its prior statements of the factual background, with particular emphasis on facts pertinent to the claims at issue in the present motion for partial summary judgment, and add a statement of those "new facts" upon which Hoffmann now relies.

The pertinent factual background actually begins with the business relationship between a company known as RJ Manufacturing, Inc. (RJM), and defendant Hoffmann. RJM, like Walker, was in the business of producing self-propelled, high-clearance crop sprayers. In January 1998, RJM contracted with Hoffmann for Hoffmann to fabricate parts to be used in RJM's crop sprayers. Pursuant to that contract, RJM supplied Hoffmann with certain design drawings and specifications, in both paper and electronic formats, each of which was clearly marked with a reservation of proprietary rights to the drawing and data shown therein. However, neither RJM nor Walker, when it acquired RJM's

---

1. Count I of Walker's Amended Complaint alleged claims under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962(c), and the Iowa Ongoing Criminal Conduct Act (IOCCA), IOWA CODE § 706A.2(1)(c). However, the court dismissed that claim by order dated April 25, 2001. *See Walker I*, 157 F.Supp.2d at 1018.

intellectual property rights, registered a copyright in the drawings or other design materials at issue. During 1998 and 1999, Hoffmann fabricated parts for RJM. When RJM became delinquent on payments under the contract with Hoffmann, RJM transferred ownership of two used crop sprayers to Hoffmann in partial payment of some of its debt to Hoffmann. However, RJM never recovered from its financial woes and, at some point in 2000, the fabrication contract was terminated. Walker purchased nearly all of RJM's assets in May 2000 and succeeded to its interest in the intellectual property at issue here either then or subsequently, by an assignment of rights. This court determined, in *Walker II*, that Walker is the "real party in interest" for claims arising from RJM's relationship with Hoffmann. *See Walker II*, 220 F.Supp.2d at 1033.

In late 1999, before the failure of RJM, Hoffmann decided to manufacture and sell its own crop sprayer, dubbed the "Silver Hawk." In early 2000, Hoffmann hired defendant Marty Sixt, a former design engineer at RJM, to assist Hoffmann with the design of Hoffmann's own sprayer, allegedly in violation of Sixt's non-competition agreement with RJM. As this court noted in its ruling on Hoffmann's first motion for partial summary judgment, although it is undisputed that Hoffmann used RJM's designs and specifications to some degree in the design of the Hoffmann sprayer, the parties hotly dispute the extent to which Hoffmann did so. *See Walker II*, 220 F.Supp.2d at 1038. The court now notes that the parties also hotly dispute the extent to which Sixt drew upon his knowledge of RJM's (or Walker's) trade secrets in the development of the Hoffmann sprayer. Walker contends that Hoffmann used the RJM drawings and specifications for the "L & S leg" and Air Bag Suspension System (ABSS) of Hoffmann's own crop sprayer. On the other hand, Hoffmann contends that Sixt independently devel-oped a "conceptually similar" ABSS for the Hoffmann sprayer and contends that the "L & S leg" was in the public domain. The parties also dispute the extent to which Hoffmann could have "reverse engineered" Walker sprayers to discover matters disclosed in the proprietary drawings and specifications that RJM provided to Hoffmann.

The parties agree that Hoffmann has never sold a Silver Hawk sprayer, but Walker denies Hoffmann's contention that Hoffmann never entered into a distributorship agreement with any person or business to do so. Walker contends that Hoffmann and J.R. Sales either reached a distributorship agreement or some other kind of agreement for J.R. Sales to "partner" with Hoffmann in the sale of Hoffmann crop sprayers. The parties apparently agree that Hoffmann only assembled one prototype of the Silver Hawk sprayer, which was never completely field tested. They also agree that a second Silver Hawk sprayer was under construction at the time that the preliminary injunction was entered in this case. However, the preliminary injunction put a hold on Hoffmann's development, manufacture, and marketing of the Silver Hawk sprayer. Hoffmann contends that, prior to the preliminary injunction, Jan Rule, of J.R. Sales, had only one "discussion" with a potential customer for the Silver Hawk, during which he showed the prospective customer an artist's rendering of the sprayer, but Hoffmann contends that Rule had no product information to accompany the artist's rendering, while Walker contends that Rule admitted in deposition testimony that he had discussed the Silver Hawk with "many people" and had sent numerous letters to potential customers promoting the Silver Hawk, at least by reference to specific features of that sprayer, if not by name. Walker also contends, and Hoffmann disputes, that associ-

ates of Mr. Rule, named Ralph McClure and Mike Fay, spoke with potential customers about the Silver Hawk sprayer. However, it is undisputed that Walker has not identified any person or entity that decided not to buy a Walker sprayer as a result of Hoffmann's conduct and Walker admits that it knows of no instance of actual consumer confusion between the Hoffmann and Walker sprayers.

Walker itself also apparently ran into financial difficulties and it is undisputed that Walker ultimately transferred substantially all of its assets to Hawkeye State Bank, including intellectual property rights and all assets acquired by Walker from RJM. However, Walker contends that it retained the rights to pursue the present litigation.[2]

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedure providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick*, 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v.*

---

**2.** In its Statement Of Disputed Material Facts In Resistance To Motion For Partial Summary Judgment, Walker asserts that there are numerous "Additional Facts" regarding Hoffmann's interference with RJM's and then Walker's business. Although these contentions plainly relate to some of Walker's claims at issue in this litigation, such as interference

with prospective business advantage, they will only be discussed in this ruling, if at all, to the extent that they are germane to the copyright, reverse palming off/unfair competition, and misappropriation of trade secrets claims that are at issue in Hoffmann's second motion for partial summary judgment.

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994). The court will apply these standards to Hoffmann's motion for partial summary judgment on issues related to Walker's copyright, reverse palming off/unfair competition, and trade secrets claims. The court deems it appropriate to take a "thematic" approach to the issues on Hoffmann's motion for partial summary judgment, much as the parties have done, rather than a claim-by-claim approach, which might be more appropriate under other circumstances.

### B. De Minimis Conduct

#### 1. Arguments of the parties

■ Hoffmann's first contention, in its second motion for partial summary judgment, is that any copyright infringement or "reverse palming off"[3] in violation of the Lanham Act that it may have engaged in was *de minimis,* so that the law is not concerned with such trifles and would bar Walker from recovering on Counts II, III, and V. Hoffmann invokes the doctrine of *de minimis non curat lex* as applicable to "reverse palming off" claims generally, and to Walker's claims in particular, because Hoffmann contends that it is undisputed that Hoffmann never sold a Silver Hawk sprayer; Hoffmann never entered into a distributorship agreement with any party concerning the Silver Hawk sprayer; Hoffmann assembled only one prototype of the machine, which was never field tested; at most Hoffmann's representatives had only general discussions about the Silver Hawk sprayer, or something like it, with potential customers; no one ever approached Ralph McClure or Mike Fay regarding purchase of a Silver Hawk sprayer; Hoffmann took steps to maintain the secrecy and confidentiality of its project to develop the Silver Hawk sprayer; and Walker has not identified any individuals to whom Hoffmann marketed the sprayer or any potential customers who decided not to purchase a Walker sprayer as a result of Hoffmann's conduct. Hoffmann relies principally on *Knickerbocker Toy Co. v. Azrak–Hamway International, Inc.,* 668 F.2d 699 (2d Cir.1982), and *Swisher Mower & Machine Co. v. Haban Manufacturing, Inc.,* 931 F.Supp. 645 (W.D.Mo.1996), in support of its contentions that its conduct was *de minimis.*

In response, Walker contends that neither Hoffmann's campaign to plunder Walker's (or RJM's) research and development nor Hoffmann's "reverse palming off" conduct was *de minimis.* Walker

---

**3.** As will be explained more fully below, when the court turns to Hoffmann's alternative contention that it simply did not engage in any "reverse palming off" or "reverse passing off" that is actionable under either the Lanham Act or state law, "reverse palming off" or "reverse passing off" consists of the defendant falsely attributing the plaintiff's product or design to itself or a third party. *See, e.g., Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 780–81 (2d Cir.1994). As this court noted in *Walker II,* courts have used the terms "reverse passing off" and "reverse palming off" interchangeably. *Walker II,* 220 F.Supp.2d at 1036 n. 10.

contends that Hoffmann's broad "scheme" included obstructing RJM's possible financial recovery, for example, by withholding parts needed for production, changing agreed upon conditions of payment, and terminating RJM's fabricating contract in bad faith; using RJM's drawings despite admitted expressions of concern about doing so by those charged with using the drawings for Hoffmann's own purposes; hiring RJM's head engineer in violation of his confidentiality agreement; making false representations to the United States Patent and Trademark Office concerning purported invention by Sixt and ownership by Sixt and Hoffmann of patents on Hoffmann's sprayer, when the purported inventions were actually derived from stolen trade secrets; otherwise attempting to destroy Walker's base of vendors and customers; and threatening Walker employees. Walker also contends that this court has previously held that there were genuine issues of material fact precluding summary judgment in Hoffmann's favor on Walker's copyright and reverse palming off/unfair competition claims.

In reply, Hoffmann asserts that Walker has failed either to address the cases cited by Hoffmann or to generate any authority of its own contrary to the application of the doctrine of *de minimis non curat lex* in the circumstances presented here. Hoffmann also argues that Walker has failed to identify any record evidence generating a genuine issue of material fact on the issue of whether or not Hoffmann's infringing conduct was *de minimis*.

### 2. The de minimis doctrine in copyright and Lanham Act law

The court finds that the doctrine of *de minimis non curat lex* has been expressly applied in cases involving both copyright and trademark—or at least, trade dress—infringement. Judge Leval of the Second Circuit Court of Appeals recently explained the general applicability of the doctrine of *de minimis non curat lex* in the context of copyright infringement as follows:

> The *de minimis* doctrine essentially provides that where unauthorized copying is sufficiently trivial, "the law will not impose legal consequences." *Ringgold [v. Black Entertainment Television],* 126 F.3d [70,] 74 [ (2d Cir.1997) ]. *See also Knickerbocker Toy Co. v. Azrak–Hamway Int'l, Inc.,* 668 F.2d 699, 703 (2d Cir.1982) (denying relief under *de minimis* doctrine where defendant had made a copy of plaintiff's work, but copy was never used); *American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 916 (2d Cir.1994) (suggesting that if photocopying for individual use in research is *de minimis,* it would not constitute an infringement); Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued,* 44 U.C.L.A. L.Rev. 1449, 1457–58 (1997).

> The *de minimis* doctrine is rarely discussed in copyright opinions because suits are rarely brought over trivial instances of copying. Nonetheless, it is an important aspect of the law of copyright. Trivial copying is a significant part of modern life. Most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law. We do not hesitate to make a photocopy of a letter from a friend to show to another friend, or of a favorite cartoon to post on the refrigerator. Parents in Central Park photograph their children perched on José de Creeft's Alice in Wonderland sculpture. We record television programs aired while we are out, so as to watch them at a more convenient hour. Waiters at a restaurant sing "Happy Birthday" at a patron's table. When we do such things, it is not that we are breaking the law but unlikely to be sued

given the high cost of litigation. Because of the *de minimis* doctrine, in trivial instances of copying, we are in fact not breaking the law. If a copyright owner were to sue the makers of trivial copies, judgment would be for the defendants. The case would be dismissed because trivial copying is not an infringement.

*On Davis v. The Gap, Inc.*, 246 F.3d 152, 172–73 (2d Cir.2001) (footnote omitted).

In *On Davis*, Judge Leval rejected The Gap's contention that the doctrine was applicable to its use of Davis's eyeglasses and jewelry in an advertisement for Gap clothing emblazoned with the word "fast," and hence described as "the 'fast' advertising":

> The Gap seeks to avail itself of the *de minimis* rule. It argues that even in advertising, it is a trivial matter for persons to be shown wearing their eyeglasses or wristwatches.
>
> The Gap's argument may well be valid in other circumstances, but does not fit these facts. Here, the combination of circumstances convinces us that the *de minimis* doctrine is not applicable. In the "fast" advertisement, the infringing item is highly noticeable. This is in part because Davis's design and concept are strikingly bizarre; it is startling to see the wearer peering at us over his Onoculii. Because eyes are naturally a focal point of attention, and because the wearer is at the center of the group—the apex of the V formation—the viewer's gaze is powerfully drawn to Davis's creation. The impression created, furthermore, is that the models posing in the ad have been outfitted from top to bottom, including eyewear, with Gap merchandise. All this leads us to conclude that the Gap's use of Davis's jewelry cannot be considered a *de minimis* act of copying to which the law attaches no consequence.

*On Davis*, 246 F.3d at 173. Thus, what persuaded Judge Leval that the *de minimis* doctrine was not applicable to this incident of alleged copyright infringement was "the combination of circumstances," including the fact that the copying was "highly noticeable," and the implication from the advertising that everything that the models in the advertisement were wearing was Gap merchandise, including the eyewear, which was actually Davis's creation, *i.e.*, an implication of a false designation of origin of the eyewear. However, Judge Leval did not consider whether or not The Gap gained anything by its copying or how many times it copied Davis's copyrighted wares.

In *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir.1997), upon which Judge Leval later relied in *On Davis*, Judge Jon O. Newman identified more specifically three meanings of "*de minimis*" in the copyright context. *See Ringgold*, 126 F.3d at 74–75. Those specific meanings are (1) "what [*de minimis*] means in most legal contexts: a technical violation of a right so trivial that the law will not impose legal consequences" ("technical" trivial violation); (2) "that copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying" (copying to a trivial extent); and (3) as relevant to "fair use," in the sense of " 'the *amount* and substantiality of the portion used in relation to the copyrighted work as a whole' " (triviality of the copied portion of the copyrighted work). *Id.* at 74–75 (quoting 17 U.S.C. § 107(3), with emphasis added in *Ringgold*); *see also Bridgeport Music, Inc. v. Dimension Films*, 230 F.Supp.2d 830, 839–42 (M.D.Tenn.2002) (considering application of the *de minimis* doctrine in copyright as "a derivation of substantial similarity, where a defendant argues that the literal copying of a small

and insignificant portion of the copyrighted work should be allowed," *i.e.*, copying to a trivial extent). However, Judge Newman suggested that the *de minimis* concept was properly applied in the first two senses, but not in the third, where a more elaborate examination of factors to determine "fair use" was appropriate. *Id.* at 75–76.

Continuing a reverse chronological survey of applications of the *de minimis* doctrine by federal courts, the court notes that Hoffmann relies on *Knickerbocker Toy Company, Inc. v. Azrak–Hamway International, Inc.*, 668 F.2d 699 (2d Cir. 1982). In *Knickerbocker Toy*, Judge Pierce considered a copyright infringement claim concerning use of a photograph of the plaintiff's toy in the defendant's "blister card," which the court explained "is a cardboard display card on which is printed promotional copy and illustrations of the product [which] is treated to accept a plastic 'blister' in which the product itself is contained for sale at retail." *Knickerbocker Toy*, 668 F.2d at 701 n. 1. The defendant's vice president of merchandising and operations testified that the blister card on which the plaintiff's claim was based was simply a sample that the defendant produced in order to position the artwork, and that a totally different illustration would be used for the production run of the card. *Id.* at 702. The district judge dismissed the copyright claim as to the blister card stating that " 'the short answer is that (the blister card) was only an office copy which was never used.' " *Id.* (quoting the court below). The appellate court's analysis was equally brief: The appellate court concluded that "on the record herein, the copyright claim with respect to the blister card falls squarely within the principle of de minimis non curat lex, and the dismissal of that claim is affirmed." *Id.* at 703. Similarly, in *Swisher Mower & Machine Company, Inc. v. Haban Manufacturing, Inc.*, 931

F.Supp. 645 (W.D.Mo.1996), upon which Hoffmann also relies, the court concluded that the doctrine of *de minimis non curat lex* was also applicable to the defendant's technical infringement of trade dress in violation of § 43(a) of the Lanham Act, where the defendant produced only one infringing prototype, which was never sold. *Swisher Mower*, 931 F.Supp. at 648.

However, the district court in *Repp v. Webber*, 914 F.Supp. 80 (S.D.N.Y.1996), rejected the defendant's argument that, because the gross receipts from the sale of products containing an infringing song within the limitations period totalled only $75.87, the *de minimis* doctrine applied to the defendant's alleged copyright infringement. *See Repp*, 914 F.Supp. at 83. The district court distinguished *Knickerbocker Toy* on the ground that, in the case before it, "substantial public sales, rather than mere internal distribution, occurred within the Limitations Period," reasoning that "[t]he law recognizes no exemption for commercially unsuccessful or unprofitable infringements." *Id.* at 84. "Whatever the ultimate scope of *Knickerbocker*," the court wrote, "it is clear that it was not meant to cover cases like the present one where significant sales occurred and a party received royalties for the public distribution of an allegedly infringing product." *Id.*

### 3. Was Hoffmann's conduct de minimis?

The court agrees with Hoffmann that much of Walker's response to Hoffmann's *de minimis* argument is not, in fact, responsive. Even if Hoffmann's composite misconduct toward Walker (and RJM) was not *de minimis*, as Walker contends, the scale of the composite misconduct is not the issue. Instead, what is at issue *on Walker's claims under the Copyright Act and the Lanham Act* is whether *copying of*

*Walker's designs* was only *de minimis.* *See On Davis,* 246 F.3d at 172–73 (examining application of the doctrine to copying of proprietary designs); *Ringgold,* 126 F.3d at 74–75 (same). Nevertheless, this conclusion about the focus for application of the *de minimis* doctrine does not mean that Hoffmann is entitled to summary judgment on Walker's copyright and reverse palming off/unfair competition claims under the *de minimis* doctrine. Rather, the question is whether Walker has generated genuine issues of material fact on the issue of the scope of Hoffmann's copying. In that context, the court notes that it has already concluded that there are genuine issues of material fact on Walker's copyright and reverse palming off/unfair competition claims, as Walker contends. Specifically, in *Walker II,* this court concluded "that the extent to which Hoffmann used the RJM/Walker designs and specifications in the Hoffmann sprayer is hotly contested." *Walker II,* 220 F.Supp.2d at 1038. In essence, then, this court has already concluded that there are genuine issues of material fact as to whether or not Hoffmann's conduct was sufficient to state a cognizable claim under the Copyright Act and the Lanham Act.

Nevertheless, to the extent that application of the *de minimis* doctrine is a "new" ground for summary judgment, it appears that Hoffmann's argument, from the terse application of the *de minimis* doctrine in *Knickerbocker Toy,* is that Hoffmann's copying, if any, falls within the *de minimis* doctrine, because "the Silver Hawk sprayer was the equivalent of an 'office copy which was never used.' " Defendant Hoffmann's Memorandum Supporting [Second] Motion For Partial Summary Judgment at 7 (quoting *Knickerbocker Toy,* 668 F.2d at 702). Similarly, from the equally abbreviated treatment of the *de minimis* conduct issue in *Swisher Mower,* Hoffmann argues that the *de minimis* doctrine applies here, because " 'only one [Silver Hawk sprayer prototype] was ever manufactured and it was never sold.' " *Id.* (quoting *Swisher Mower,* 931 F.Supp. at 648). However, the court does not agree that the *de minimis* doctrine is properly applicable on the present record—at the very least, the court concludes that there is a genuine issue of material fact as to whether or not application of the doctrine would be proper in the circumstances presented here.

First, on the record presented here, this case is *not* analogous to *Knickerbocker Toy.* The Hoffmann Silver Hawk sprayer was not merely "an office copy," but a prototype of a sprayer *intended for production and sale. Compare Knickerbocker Toy,* 668 F.2d at 702 (the only evidence in the record concerning the defendant's use of the "blister card" was that it was "a sample . . . produced in order to position the artwork, and that a totally different illustration would be used for the production run of the card"). Certainly, Walker has generated a genuine issue of material fact as to whether or not Hoffmann, through J.R. Sales, for example, was attempting to market the Silver Hawk sprayer even before the sprayer was field tested. Moreover, on the record before the court, the only reason such sales were not pursued *was that such sales were enjoined on the application of the plaintiff here,* which effectively distinguishes this case from both *Knickerbocker Toy,* where the defendant never intended to make more than an "in-house" copy improperly using a photograph of the plaintiff's product, and from *Swisher Mower,* where the defendant itself decided not to pursue manufacture of the prototype. *See Swisher Mower,* 931 F.Supp. at 647 (the defendant did not manufacture any more mowers of the particular design of the prototype, but instead made several changes to the design resulting in a production model).

Second, as the district court in *Repp* recognized, "[t]he law recognizes no exemption for commercially unsuccessful or unprofitable infringements." *Repp*, 914 F.Supp. at 84. Thus, the fact that Hoffmann never managed to make a sale of its allegedly infringing sprayer, before it was prevented from making comprehensive attempts to do so, does not seem to the court to be the issue in application of the. *de minimis* doctrine. Whatever the ultimate scope of *Knickerbocker Toy*, it seems clear to this court that the *de minimis* doctrine was not meant to cover cases in which there is record evidence that the defendant made a concerted effort to copy the design of a competitor for the purpose of producing a marketable product on which the defendant *intended* to make significant sales. *Cf. Repp*, 914 F.Supp. at 84 ("Whatever the ultimate scope of *Knickerbocker*, ... it is clear that it was not meant to cover cases like the present one where significant sales occurred and a party received royalties for the public distribution of an allegedly infringing product.").

To the extent that *Swisher Mower* might support a different result—because in that case, the defendant also offered a prototype for sale, but discontinued the prototype design after failing to make any sales at a trade show, *see Swisher Mower*, 931 F.Supp. at 647—this court must respectfully disagree with the court in *Swisher Mower* and, indeed, with the focus in *Knickerbocker Toy*. It appears to this court that the "wrong" addressed by the Copyright Act and the Lanham Act, and measured by the *de minimis* doctrine, is in the *copying* of the idea or design of another *with intent to use the copied material for an improper purpose*, not in the infringer's degree of commercial success with the copied design. *See On Davis*, 246 F.3d at 172–73; *Ringgold*, 126 F.3d at 74–75; *accord Repp*, 914 F.Supp. at 84. For example, on the present record, the copying at issue here is nothing like making a

photocopy of a letter from a friend to show to another friend, or of a favorite cartoon to post on the refrigerator; photographing one's children on a sculpture that is the creation of another; recording television programs aired while one is out, so as to watch them at a more convenient hour; or waiters at a restaurant singing "Happy Birthday" at a patron's table. *See On Davis*, 246 F.3d at 173 (giving these examples of *de minimis* copying that simply do not violate the Copyright Act). There are, at the very least, genuine issues of material fact that Hoffmann set out to copy components of a commercial product of another, knowing those components were deemed proprietary by the owner, with the intent of producing a competing product. To put it another way, the copying at issue here is simply not—or at least there are genuine issues of material fact that it was not—"a technical violation of a right so trivial that the law will not impose legal consequences," *i.e.*, a "technical" violation, *see Ringgold*, 126 F.3d at 74–75 (first meaning of *"de minimis"* for purposes of copyright law), but a purposeful copying of components with commercial value with the intention of exploiting their commercial value. Nor, on the present record, did Hoffmann's conduct involve only "copying ... to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying," *i.e.*, copying only to a trivial extent, *see Ringgold*, 126 F.3d at 74–75 (second meaning of *"de minimis"* for purposes of copyright law), but complete appropriation of proprietary design features for purposes of incorporating those specific features, or at least "substantially similar" ones, into a competing product.

Hoffmann is not entitled to summary judgment on Walker's copyright and reverse palming off/unfair competition claims

on the ground that Hoffmann's conduct was purportedly only *de minimis.*

### C. *"Reverse Palming Off"*

#### 1. *Arguments of the parties*

■ Hoffmann next contends that there is no genuine issue of material fact that it did not engage in "reverse passing off" or "reverse palming off" in violation of the Lanham Act or state law. Hoffmann argues that this case does not involve Hoffmann's purchase of Walker's goods, removal of Walker's marks, and reselling of Walker's goods, nor does it involve Hoffmann's purchase of Walker's goods, slight modification of those goods, removal of Walker's marks, and then reselling of the goods. Hoffmann also argues that this case does not involve Hoffmann's marketing as its own goods that were actually manufactured, produced, or supplied by Walker. Instead, Hoffmann contends that this case involves alleged copying by Hoffmann of certain components of Walker's sprayer design, which Hoffmann then manufactured, produced, and supplied as part of the development of the Silver Hawk sprayer. However, Hoffmann contends that these allegations of "copying" do not support a "reverse palming off" claim. This is so, Hoffmann argues, because courts have recognized that a party has the right to copy unpatented products, or even to incorporate unpatented products or elements of another's product into its own product, then manufacture its own "new" product. Hoffmann relies primarily on *Roho, Inc. v. Marquis,* 902 F.2d 356 (5th Cir.1990), in support of this contention.

Walker, however, contends that "reverse palming off" cases also bar the sort of "copying" at issue here. Relying principally on *Pioneer Hi–Bred v. Holden Foundation Seeds,* 35 F.3d 1226 (8th Cir.1994), Walker contends that the Lanham Act proscribes selling as one's own a product that is necessarily derived from the intellectual property of another *without acknowledging the proper source of the intellectual property—i.e.,* taking credit for someone else's work. Walker contends that there are, at least, genuine issues of material fact that Hoffmann used Walker's intellectual property in the Silver Hawk sprayer without attribution of the incorporated designs to Walker or RJM.

In reply, Hoffmann contends that the commentator upon whom both parties have relied, John T. Cross, *Giving Credit Where Credit Is Due: Revisiting the Doctrine of Reverse Passing Off in Trademark Law,* 72 WASH. L. REV. 709 (July 1997), actually opposes reading the Lanham Act to proscribe the sort of "copying" upon which Walker's claim relies. Hoffmann also contends that the decision in *Pioneer Hi–Bred* is distinguishable, because it did not involve copying, but instead involved a slight modification and relabeling by the defendant of genetic material acquired from Pioneer. How, exactly, such a distinction works to Hoffmann's benefit, however, is not clear from Hoffmann's brief.

#### 2. *Source and nature of the Lanham Act's prohibition*

In *Walker II,* this court provided the following general discussion of "reverse palming off" or "reverse passing off" claims:

> The applicable portion of the Lanham Act provides:
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, *uses in commerce* any word, term, name, symbol, or device, or any combination thereof, *or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—*

(A) *is likely to cause confusion, or to cause mistake, or to deceive* as to the affiliation, connection, or association of such person with another person, or *as to the origin,* sponsorship, or approval *of his or her goods,* services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added).

False designation of origin falls within the practice known as "reverse passing off" or "reverse palming off," described by the Eighth Circuit Court of Appeals in *Pioneer Hi–Bred International v. Holden Foundation Seeds, Inc.,* 35 F.3d 1226 (8th Cir.1994), as follows:

The typical Lanham Act claim involves one of two factual patterns: (1) a defendant's false advertising of its goods or services; or (2) the selling or "palming off" by a defendant of its goods by use of a competitor's name. *Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403, 1406 (9th Cir.1988). The statute, however, extends beyond these isolated patterns, reaching those situations which are "economically equivalent to palming off." *Smith v. Montoro,* 648 F.2d 602, 605 (9th Cir. 1981) (internal quotation omitted). . . .

Reverse palming off is essentially the defendant's unauthorized removal of plaintiff's product's identifying marks before reselling the goods. [Footnote omitted.] *Montoro,* 648 F.2d at 605; *Web Printing Controls Co. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1203 n. 1 (7th Cir.1990). The doctrine

includes situations in which a defendant markets another's product that has been only slightly modified and then relabeled. *See Roho, Inc. v. Marquis,* 902 F.2d 356, 359 (5th Cir. 1990); *Arrow United Indus., Inc. v. Hugh Richards, Inc.,* 678 F.2d 410, 412, 415 (2d Cir.1982).

*Pioneer Hi–Bred,* 35 F.3d at 1241.

*Walker II,* 220 F.Supp.2d at 1037 (emphasis in the original); *see also Woodke v. Dahm,* 873 F.Supp. 179, 189–92 (N.D.Iowa 1995) (discussing various permutations of the prohibition on "palming off" and "reverse palming off" under the Lanham Act), *aff'd,* 70 F.3d 983 (8th Cir.1995).

■ Thus, while "palming off" (or "passing off") involves "A" selling its product under "B's" name, "reverse palming off" (or "reverse passing off") involves "A" selling "B's" product under "A's" name. *See, e.g., Attia v. Society of New York Hosp.,* 201 F.3d 50, 59 (2d Cir.1999) (citing *Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 780 (2d Cir.1994), and Restatement (Third) of Unfair Competition § 5 (1995)), *cert. denied,* 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 67 (2000). In order to prove a "false designation of origin" claim premised on "reverse palming off," the plaintiff must prove (1) that the work, product, or design at issue originated with the plaintiff; (2) that the origin of the work, product, or design was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin. *See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 970 (2d Cir.1997) (citing *Lipton v. Nature Co.,* 71 F.3d 464, 473 (2d Cir.1995), in turn citing *Waldman Publ'g,* 43 F.3d at 781–85), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *see also* 15 U.S.C. § 1125(a)(1)(A)

(statutory prohibition on false designation of origin cast in terms that track these elements).

### 3. "Copying" as "reverse palming off"

#### a. Cognizability in light of elements of the claim

■ The court rejects Hoffmann's contention that Walker's claim is not a cognizable claim of "reverse palming off." First, the court concludes that Walker's claim of "reverse palming off" in this case is cognizable under the elements of a "reverse palming off" claim as defined, for example, in *Softel*, *Lipton*, and *Walman*: Walker alleges (1) that the design for certain components at issue originated with Walker, in the form of drawings of components, clearly marked as proprietary, that RJM provided to Hoffmann so that Hoffmann could fabricate the components for RJM to incorporate into RJM's own sprayer; (2) that the origin of the design of the components was falsely designated by Hoffmann, in the sense that Hoffmann then used the components in its own sprayer without attribution to Walker or RJM; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that Walker was harmed by Hoffmann's false designation of origin. *See Softel, Inc.*, 118 F.3d at 970; *Lipton*, 71 F.3d at 473; *Waldman Publ'g*, 43 F.3d at 781–85; *see also* 15 U.S.C. § 1125(a)(1)(A).

Moreover, the court finds that other courts have also recognized "reverse palming off" claims in circumstances sufficiently similar to those presented here to justify consideration of Walker's "reverse palming off" claim. The court will, therefore, survey some of those key cases.

#### b. Cognizability in light of Pioneer Hi–Bred

The first such case is the one upon which Walker relies, the decision of our own Circuit Court of Appeals in *Pioneer Hi–Bred International v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226 (8th Cir. 1994). In *Pioneer Hi–Bred*, the court explained that "[r]everse palming off is essentially the defendant's unauthorized removal of plaintiff's product's identifying marks before reselling the goods," and that "[t]he doctrine includes situations in which a defendant markets another's product that has been only slightly modified and then relabeled." *Pioneer Hi–Bred*, 35 F.3d at 1241. The appellate court in *Pioneer Hi–Bred* then concluded that the district court's finding that the defendant, Holden, possessed plaintiff Pioneer's seed corn hybrid, H3H/H43SZ7, in the form of a seed corn hybrid identified as LH38–39–40, was not clearly erroneous. *Id.* The appellate court also noted certain additional findings by the district court:

> The district court found that Holden held out during all relevant times, "and still does now, that LH38 and LH39 were developed *solely* by Holden by use of L120." Slip op. at 70 (emphasis in the original). The court cited testimony indicating that Holden marketed LH38 × B73, for example, by displaying it alongside Pioneer's 3541. According to the court, "[t]he obvious intended message" was that Holden possessed its "own corn as good or better than Pioneer['s]." *Id.*

*Pioneer Hi–Bred*, 35 F.3d at 1241 n. 46. The appellate court then upheld the district court's finding of "reverse palming off," as follows:

> Neither [Holden's] advertising nor its registration under the Plant Variety Protection Act referred to the existence of Pioneer's genetic material in its pedigree. This misrepresentation as to the

origin of LH38–39–40 implicates several concerns protected by the Lanham Act's prohibition on reverse palming off. For instance, Holden's claims of independent development denied Pioneer "the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Smith [v. Montoro],* 648 F.2d [602,] 607 [ (9th Cir. 1981) ]. "The ultimate purchaser is harmed as well by the loss of knowledge of and possible deception regarding the true source of the product or service." *Roho,* 902 F.2d at 359. In light of these concerns and on the facts before it, the district court did not err in concluding that Holden violated the Lanham Act by reverse palming off Pioneer's genetic material as its own.

*Pioneer Hi–Bred,* 35 F.3d at 1241–42. Similarly, here, Walker contends—and has generated genuine issues of material fact—that Hoffmann misappropriated its design drawings; subsequently developed and attempted to market a sprayer incorporating Walker's designs, and attempted to patent as its own designs derived from the Walker designs; and did so without referring to the existence of Walker's designs in the "pedigree" of the Hoffmann sprayer or patent applications. *Id.* at 1241; *see also Softel, Inc.,* 118 F.3d at 970 ("origination" and "false designation of origin" elements of a "reverse palming off" claim). Walker also alleges that potential customers are likely to be confused about the "originator" of the designs in question, with the resulting harm to Walker resulting from loss of the advertising value of its name and the goodwill that would stem from public knowledge of the true source of the satisfactory design elements. *Id.* at 1242; *see also Softel, Inc.,* 118 F.3d at 970 ("consumer confusion" and "harm" elements).

Hoffmann's attempt to distinguish *Pioneer Hi–Bred* is both confusing and unpersuasive. First, it is not clear how it benefits Hoffmann that *Pioneer Hi–Bred* is purportedly distinguishable on the basis that *Pioneer Hi–Bred* did not involve copying, but instead involved a slight modification and relabeling by the defendant of genetic material acquired from Pioneer. *See* Defendant Hoffmann's Reply To Walker Manufacturing's Resistance To Motion For Partial Summary Judgment at 3. The court believes that the conduct at issue here is analogous to the conduct at issue in *Pioneer Hi–Bred,* whether or not the conduct is described as "copying." In both *Pioneer Hi–Bred* and the present case, the plaintiff's proprietary matter was at least alleged to be the "genesis" for a product ultimately produced by the defendant, without attribution to the plaintiff. If anything, it would be reasonable to find from the record that Hoffmann's "realization" of Walker's drawings and the incorporation of the "realized" components into the Hoffmann sprayer was analogous to the "slight modification and relabeling" of genetic material obtained by the defendant from the plaintiff, and the reselling of the relabeled material as the defendant's own, which was at issue in *Pioneer Hi–Bred.*

■ 'Under *Pioneer Hi–Bred,* therefore, Hoffmann is not entitled to summary judgment on the ground that its conduct does not fall within the Lanham Act's prohibition on "reverse palming off." Moreover, the court finds that there are genuine issues of material fact on the elements of such a "reverse palming off" claim, as defined in *Pioneer Hi–Bred,* because the extent of the "copying" or "modification and relabeling" of RJM's designs is hotly disputed. *See Walker II,* 220 F.Supp.2d at 1038 ("It is readily apparent from the parties' summary judgment papers that the extent to which Hoffmann used the RJM/Walker designs and specifications in

the Hoffmann sprayer is hotly contested.").

### c. Cognizability in light of Waldman Publishing

The court also finds that *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir.1994), supports the viability of Walker's "reverse palming off" claim. In *Waldman*, the court explained what "reverse palming off" ordinarily means in the context of manufactured products and written works, as follows:

> The typical reverse passing off case involves a manufactured product rather than a written work. For example, the defendant, Richards, in *Arrow United Industries v. Hugh Richards, Inc.*, 678 F.2d 410 (2d Cir.1982), used a product (an industrial damper) manufactured by the plaintiff, Arrow, reduced it slightly, affixed its own identifying marks, and represented to a customer that the product was its own. *Id.* at 412, 415. The court held that this activity constituted "affixing" a "false designation of origin" in violation of the Lanham Act. *Id.* at 415. The designation was false because Arrow was the true manufacturer of the product, and by affixing its name, Richards misappropriated Arrow's manufacturing talents. *Id.; see also Roho*, 902 F.2d at 359 ("[t]raditional and reverse palming off activities have both been recognized as wrongful because they involve attempts to misappropriate another's talents"). This was true even though Richards had modified the product slightly. *Arrow*, 678 F.2d at 415.
>
> Reverse passing off as applied to a written work involves somewhat different concepts. In the context of written works, the Lanham Act may be used to prevent "the misappropriation of credit properly belonging to the original creator" of the work. *Restatement* § 5, cmt. (c); *see also* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer on Copyright*") § 8.21[E] (1994) (an author may claim violation of section 43(a) if his work is published without his name). In this context, the Lanham Act prohibits not only, as Landoll suggests, the relabeling of a printed work, as by tearing the cover off a book and selling it with a false cover, but also the reproduction of a work with a false representation as to its creator. The misappropriation is of the artistic talent required to create the work, not of the manufacturing talent required for publication.

*Waldman Publ'g*, 43 F.3d at 780–81.

In *Waldman*, the court first concluded that the plaintiff's works, even though they were adaptations of classic tales in the public domain, were sufficiently "original" to be protected, because "[t]he selection of which episodes in the classics to include in the books, the redrafting of the text to tailor the books to young readers and the illustrations add more than a quantum of originality to the original works." *Id.* at 782. The court next concluded that the books of the alleged copyist were "substantially similar" to the plaintiff's books, so that the copyist's failure to credit the plaintiff constituted false designation of origin. *Id.* at 782–83. In reaching this conclusion, the court noted the following:

> We find this [substantial similarity] standard is an appropriate one for determining false origin under the Lanham Act. A second work can be said to have the same origin as a first if the second was copied from the first. When the two works are identical, copying can almost always be assumed. When the works are somewhat different, copying can be established as it is in copyright infringement.

*Waldman Publ'g*, 43 F.3d at 783. The court also accepted the district court's conclusion that the alleged copyist's books

were copied from the plaintiff's books, and thus had a common origin, because they were "substantially similar." *Id.* at 783. For example, the court found that the copyist had "ample access" to the plaintiff's books, because they had been on the market for many years; the principal of the copyist company had distributed the plaintiff's books before he created his own, allegedly copied, books; the alleged copies were similar in structure, text, and illustration to the plaintiff's books; and the similarities between the books extended beyond the underlying story, which was in the public domain, to selection of episodes, scenes to illustrate, and what chapter headings to use. Therefore, "absent a showing of independent creation, the inference is that Landoll falsely designated the origin of its books by indicating its own authors as the source of the adaptations." *Id.* Carrying the analysis beyond the point at which the district court stopped, the appellate court considered that "[f]alse designation of origin, as applied to written work, deals with false designation of the creator of the work; the 'origin' of the work is its author." *Id.* However, the district court had not determined who the author or authors of the plaintiff's books were, and hence, had not determined who should be credited on the copyist's books. *Id.* The issue on this prong of the analysis in *Waldman,* therefore, was whether or not the plaintiff's works were created as "works for hire," which would have made the plaintiff, rather than the individual authors working for the plaintiff, the source of the works. *Id.* at 783–84.

As to the "likelihood of consumer confusion" element of a "reverse palming off" claim based on "copying," the court in *Waldman* determined that "a likelihood of consumer confusion" could be shown by demonstrating that consumers will be led to believe falsely that the defendant, not the plaintiff, was the source of the works, where the purported copies are "substan-

tially similar" to the plaintiff's works; the court rejected the Ninth Circuit standard, which required "bodily appropriation" of the originals to establish consumer confusion, as an unnecessary bright-line rule. *Id.* (rejecting, for example, *Cleary v. News Corp.,* 30 F.3d 1255, 1261 (9th Cir.1994), and *Shaw v. Lindheim,* 919 F.2d 1353, 1364 (9th Cir.1990)).

Finally, as to the element of "harm" to the plaintiff, the court in *Waldman*—like the Eighth Circuit Court of Appeals in *Pioneer Hi–Bred,* as mentioned above—identified the harm from reverse palming off as depriving the originator of the misidentified product of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product, citing *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir.1981), and the resulting "diversion of trade" from the party seeking relief, citing RESTATEMENT OF UNFAIR COMPETITION § 5, cmt. (c). *Waldman Publ'g,* 43 F.3d at 785. However, the court rejected the district court's finding that harm should be based on sales made by the defendant, which would have been made by the plaintiff, if the defendant's alternative had not been available. *Id.* Rather, the court concluded that the proper "harm" to consider in a "reverse palming off" case is the harm arising from the false designation of origin, not whether there was harm from sales of the alternative, because the defendant ultimately could not be prohibited from selling its alternative, only from doing so with a false representation as to the source of its alternative. *Id.*

This case, admittedly, falls somewhere between reverse palming off of a manufactured product, in the form of slightly modifying the product of another, then relabeling and reselling it as one's own, and copying a written work, then publishing it as one's own. *See id.* at 780–81. Never-

theless, in this case, Hoffmann allegedly appropriated RJM's drawings of proprietary designs of certain components, then realized them by manufacturing them and incorporating them into the Hoffmann sprayer, without attribution of origin of the designs to RJM, which falls within the scope of the "copying" prohibited by § 43(a) of the Lanham Act, as defined in *Waldman.* Moreover, there are genuine issues of material fact as to whether or not Hoffmann did engage in such conduct. *See Walker II*, 220 F.Supp.2d at 1038.

■ More specifically, there is no dispute here that RJM is the "originator" of the designs in question, *cf. Waldman Publ'g*, 43 F.3d at 781–82 (determining whether or not the plaintiff was the "originator" of adaptations of classic tales), even if there is a "hot" dispute between the parties as to the extent to which Hoffmann "copied" RJM's designs. Also, genuine issues of material fact concerning the extent of "copying" are present here for essentially the same reasons that copying could be found in *Waldman:* Hoffmann undeniably had "ample access" to the RJM designs, because they had been provided to Hoffmann; indeed, Hoffmann fabricated the components for RJM, based on the designs, before fabricating allegedly substantially similar components for its own sprayer. *Cf. id.* at 783 (the alleged copyist had distributed the plaintiff's works before creating his alleged copies). Here, whether or not the components produced by Hoffmann are "identical" or "substantially similar" to the RJM designs is plainly in dispute, as is whether or not Hoffmann "independently created" its own components. *Cf. id.* ("[A]bsent a showing of independent creation, the inference is that [the copyist] falsely designated the origin of its books by indicating its own authors as the source of the adaptations," where the books were "substantially similar").

■ As to "likelihood of consumer confusion," there are, again, genuine issues of material fact as to the extent to which the Hoffmann components are "substantially similar" to the RJM designs; this court agrees with the court in *Waldman* that a bright-line rule, which requires "bodily appropriation" for a cognizable "reverse palming off" claim, is not necessary. *Id.* at 784. Finally, there are genuine issues of material fact on the present record as to whether or not RJM was harmed by the false representation of origin of the designs, because the question is *not* whether or not RJM would have made sales if the Hoffmann alternative had not been available, but whether or not RJM was deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product. *Id.* at 784–85; *see also Pioneer Hi–Bred*, 35 F.3d at 1242. This court has already determined that there are genuine issues of material fact as to the extent to which Hoffmann attempted to market its own sprayer, without proper attribution of design features to RJM/Walker. *Walker II*, 220 F.Supp.2d at 1038. Hoffmann's "new" evidence—that Hoffmann purportedly never marketed the Silver Hawk sprayer and that Walker cannot identify any sales that it lost because of Hoffmann's purported failure to attribute design features of the Silver Hawk to Walker—does not resolve these factual disputes, because Walker has again pointed to contrary evidence concerning Hoffmann's efforts to market its own sprayer. *See* FED. R. CIV. P. 56(e) (the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka*, 122 F.3d at 562;

*McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. The evidence to which Walker points includes evidence that Rule admitted in deposition testimony that he had discussed the Silver Hawk with "many people" and had sent numerous letters to potential customers promoting the Silver Hawk, at least by reference to specific features of that sprayer, if not by name, and evidence that associates of Mr. Rule, named Ralph McClure and Mike Fay, spoke with potential customers about the Silver Hawk sprayer.

### d. Cognizability in light of Montgomery and Roho

Finally, the court finds instructive the decision of the Eleventh Circuit Court of Appeals in *Montgomery v. Noga,* 168 F.3d 1282 (11th Cir.1999), for its own sake, and for its effective response to Hoffmann's argument that *Roho, Inc. v. Marquis,* 902 F.2d 356 (5th Cir.1990), should bar Walker's "reverse palming off" claim. In *Montgomery,* the court was presented with a "reverse palming off" claim that is, perhaps, most like the one asserted here, although the court in *Montgomery* was principally considering only the question of whether or not the act of placing a copyright notice on an infringing product can be a "false designation of origin" under § 43(a) of the Lanham Act. *See Montgomery,* 168 F.3d at 1297–1300. However, the pertinent portion of the case for present purposes was the extended discussion of *Roho, Inc.,* in a footnote:

> We recognize that in false designation of origin claims of the "reverse passing off" variety, the defendant often has merely removed the plaintiff's mark from a product, added its own mark, and sold the product without altering it in any other way. *In this case, however, the defendants incorporated Montgomery's VPIC product into their own CD-ROM products. It could be argued that, in light of Roho, Inc. v. Marquis, 902*

F.2d 356 (5th Cir.1990), this factual distinction is relevant to our determination of whether Montgomery has stated a claim for false designation of origin.

In *Roho,* the plaintiff manufactured specialized wheelchair cushions and hospital mattresses. Its mattresses were constructed by assembling four wheelchair cushions together. The defendants bought several of the plaintiff's wheelchair cushions, removed the plaintiff's labels, fastened ten of the cushions together to make a mattress, and attached their own tag to the mattress. The plaintiff sued the defendants for, *inter alia,* reverse passing off under the false designation of origin prong of section 43(a). *See id.* at 357–58.

The court began its analysis by noting that the doctrine of reverse passing off is applicable in situations where a defendant resells another person's product that has been only "slightly modified." Finding that the essence of the plaintiff's claim was that the defendant had purchased one of the plaintiff's products and sold it in modified form under a different label, the court proceeded to compare the plaintiff's cushions with the defendants' mattress. It found that the defendants had substantially modified the plaintiff's cushions by attaching them together to create a mattress; furthermore, the mattress and cushions were marketed to different consumers for different purposes. Therefore, the court held that the defendants were not simply reselling a relabeled and slightly modified version of the plaintiff's product. Instead, the defendants' mattress was a new product to which they could properly apply their own label. *See id.* at 360–61.

We assume *arguendo* that *Roho* is applicable in our circuit. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:81 (4th

ed.1996) (discussing the level of similarity between the defendant's and plaintiff's works that must be demonstrated in order to bring a reverse passing off claim, including the Second Circuit's requirement (which is similar to *Roho's* "slightly modified" requirement) of "substantial similarity" and the Ninth Circuit's requirement of "bodily appropriation"); *but see Debs v. Meliopoulos,* 1993 WL 566011 (N.D.Ga.1991) (rejecting any requirement of either bodily appropriation or substantial similarity and focusing instead on likelihood of confusion). *This assumption, however, does not affect our conclusion that Montgomery has stated a claim for false designation of origin. The defendants in Roho escaped liability not because they incorporated the plaintiff's product into their own, but because this incorporation substantially modified both the physical attributes and the purpose of the plaintiff's product. In this case, however, Montgomery created VPIC for the purpose of allowing computer users to view picture files. Without reprogramming VPIC, the defendants incorporated it into their CD–ROM discs for the purpose of allowing users to view the pictures on the discs. Courts have not hesitated to find defendants liable for false designation of origin in such circumstances. See, e.g., F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 214 U.S.P.Q. 409, 416–17 (7th Cir. 1982) (finding that defendant who excluded plaintiff's name from custom-made hymnals that incorporated plaintiff's songs and bore the names of defendant's parishes would be liable for false designation of origin if the users of the hymnals were likely to be confused as to the origin of the songs); *Sega Enters. Ltd. v. MAPHIA,* 948 F.Supp. 923, 938–39 (N.D.Cal.1996); *Playboy Enters., Inc. v. Frena,* 839 F.Supp. 1552, 1562 (M.D.Fla.1993) (defendant who substituted his own advertisement for plaintiff's trademark on certain photographs and incorporated these photographs into his computer bulletin board system held liable for false designation of origin). *Montgomery,* 168 F.3d at 1299 n. 27 (emphasis added). Thus, as *Montgomery* explains, *Roho* does not stand for the broad proposition that "copying" is not cognizable as a claim of "reverse palming off," but for the proposition that "copying" with substantial modification of physical attributes and purpose, which results in a new product, is not cognizable as "reverse palming off." On the other hand, *Montgomery* stands for the proposition that incorporation, without attribution, of a plaintiff's design or product as a component of the defendant's product, at least where the product or design is used for the purpose for which it was originally intended, constitutes "reverse palming off." *Id.*

Again, for the reasons detailed above, the circumstances alleged here fit within the "reverse palming off" claim recognized in *Montgomery,* and there are genuine issues of material fact as to whether or not the record here would support a finding in the plaintiff's favor on such a claim. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (ultimately, the necessary proof that the nonmoving party must produce to avoid summary judgment is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party"); *Allison,* 28 F.3d at 66. Repeating only the most critical issue of fact, the court notes that Walker has both alleged and pointed to evidence that Hoffmann copied and incorporated Walker's designs, without attribution to Walker, as a component of Hoffmann's product, and in Hoffmann's product, those designs were used for the same purpose for which they were originally intended by Walker. *See Montgomery,* 168 F.3d at 1299 n. 27.

### 4. Conclusion

In light of the foregoing, the court concludes that Hoffmann is not entitled to summary judgment on Walker's copyright and reverse palming off/unfair competition claims, either on the ground that Walker's claim is not a cognizable claim of "reverse palming off," or on the ground that the undisputed facts establish that Hoffmann did not engage in "reverse palming off."

### D. Actual Consumer Confusion

### 1. Arguments of the parties

Next, Hoffmann seeks summary judgment on Walker's Lanham Act claim and Walker's correlate claim of unfair competition under Iowa law on the ground that there is no evidence of "actual consumer confusion." Hoffmann contends that the absence of any evidence of "actual consumer confusion" means that Walker cannot prove or recover any money damages on the claims in Counts II and V. Hoffmann argues, further, that the lack of any evidence of "actual consumer confusion" is a reflection of the *de minimis* nature of its conduct.

Walker, however, contends that "actual consumer confusion" is not an element of its Lanham Act claim; rather, § 43(a) prohibits conduct that "is *likely* to cause confusion." 15 U.S.C. § 1125(a) (emphasis added). Walker contends that its evidence that the Silver Hawk sprayer was built on Walker's components without attribution is sufficient to support a finding that the marketing of the Silver Hawk was likely to cause confusion about its origin, as is the evidence of Hoffmann's and Sixt's false patent application, concerning the ABSS, which failed to attribute the invention to Walker.

In reply, Hoffmann argues that, whether or not "actual consumer confusion" is an element of *a claim* of a Lanham Act violation, it is an essential element of proof *for entitlement to money damages* on such a claim under Eighth Circuit precedent.

### 2. Analysis

In the first instance, the court agrees with Walker that "actual consumer confusion" is *not* an "element" of a "false designation of origin" or "reverse palming off" claim under § 43(a) of the Lanham Act; rather, the statute authorizes a civil action where the defendant's misconduct "is *likely* to cause confusion." *See* 15 U.S.C. § 1125(a)(1)(A) (emphasis added); *see also Softel, Inc.*, 118 F.3d at 970 (the elements of such a claim are (1) that the work, product, or design at issue originated with the plaintiff; (2) that the origin of the work, product, or design was falsely designated by the defendant; (3) that the false designation of origin was *likely* to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin); *Lipton*, 71 F.3d at 473 (same); *Waldman Publ'g*, 43 F.3d at 781–85 (same). Nevertheless, it is the law of this circuit that "[p]roof of actual confusion is necessary for an award of damages" on such a claim, as Hoffmann argues, although "[i]n order to obtain injunctive relief, proof of likelihood of confusion is required." *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 n. 5 (8th Cir.1990) (citing *Co–Rect Prods., Inc., infra* ); *Co–Rect Prods., Inc. v. Marvy! Advertising Photo., Inc.*, 780 F.2d 1324, 1329–30 (8th Cir.1985) (citing *Warner Brothers v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981)).

Walker has failed to designate any portion of the record generating a genuine issue of material fact as to "actual consumer confusion." *See* Fed. R. Civ. P. 56(e) (the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106

S.Ct. 2548; *Rabushka*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325. Because "actual consumer confusion" is an essential element of Walker's prayer for money damages on its reverse palming off/unfair competition claim, and Walker has not generated a genuine issue of material fact on that element, Hoffmann is entitled to summary judgment on Walker's prayer for money damages on that claim. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re TMJ Implants Prod. Liab. Litig.*, 113 F.3d at 1492. However, Hoffmann is *not necessarily* entitled to summary judgment on Walker's claim of reverse palming off/unfair competition, because Walker has already obtained preliminary injunctive relief, and may be entitled to other relief.

### E. Permanent Injunctive Relief

Hoffmann next contends that it is also entitled to summary judgment on Walker's prayer for permanent injunctive relief on each of its claims, including the Lanham Act claim (Count II), misappropriation of trade secrets (Count IV), unfair competition under Iowa law (Count V), breach of contract (Count VI), fraudulent non-disclosure (Count VII), breach of fiduciary duty (Count VIII), and interference with prospective business advantage (Count IX). This is so, Hoffmann argues, because this court has already concluded that Walker's prayer for permanent injunctive relief on its copyright infringement claim (in Count III) was rendered moot by Walker's transfer of substantially all of its assets to Hawkeye State Bank, *see Walker II*, 220 F.Supp.2d at 1040–41, and the court's "mootness" analysis applies with equal force to the other claims, as well. Walker concedes this point, as follows:

It is true that Walker, having had its business destroyed, can no longer be remedied by an injunction that prohibits Hoffmann from selling sprayers. Walker joins Hoffmann in requesting that the prayer for an injunction be dismissed. Walker notes that the prior [preliminary] injunction dissolved by its own terms after one growing season.

Walker's Brief In Support Of Walker's Resistance To Hoffmann, Inc., Second Motion For Partial Summary Judgment at 13–14. Therefore, summary judgment will be granted in Hoffmann's favor on Walker's prayer for permanent injunctive relief on Counts II through IX.

### F. Scope Of Misappropriation Of Trade Secrets Claim

#### 1. Arguments of the parties

As its penultimate issue in its second motion for partial summary judgment, Hoffmann contends that the only "trade secrets" that Walker has identified as the basis for its claim of misappropriation of trade secrets (Count IV) are the "L & S leg assembly" and the air bag suspension system (ABSS). This is so, Hoffmann argues, in light of Walker's arguments in the preliminary injunction hearing and the discovery to date. Hoffmann also argues that any other purported "trade secrets" were in fact "readily ascertainable," so that they are not subject to protection under Iowa law. Hoffmann argues that any "secrecy" is necessarily lost when the design or product is placed on the market, and the record evidence is that RJM had sold numerous Walker sprayers to the public during its existence. Hoffmann also argues that the agricultural sprayer market is "highly competitive" and that reverse engineering of competitor's designs is a common practice, and would have been relatively simple in this case, according to its expert.

In response, Walker contends that all of the engineering drawings that it provided

to Hoffmann have been identified with the requisite specificity in the course of discovery and that all of these drawings meet the definition of "trade secrets," regardless of whether some information contained in the drawings could have been discovered by reverse engineering—which Walker points out Hoffmann does not contend is the manner in which Hoffmann obtained any alleged trade secrets. Walker contends that, so long as it derived some value from keeping the information secret and made attempts to keep it secret, the information is considered a trade secret under Iowa law. Walker also contends that Hoffmann misappropriated trade secrets known to Marty Sixt, which Sixt gained from his knowledge of RJM's research and development programs, and Hoffmann obtained by hiring Sixt. Finally, Walker contends that the extent to which a particular item is a trade secret is a fact question for the jury to decide.

In reply, Hoffmann argues that Walker has failed to carry its burden to identify sufficiently its alleged trade secrets by claiming "all of [Walker's] confidential drawings were trade secrets," and merely attaching a list of computer files. Hoffmann argues that Walker has failed to provide the drawings or any information about them that would allow the court or a trier of fact to evaluate whether or not the drawings meet the Iowa definition of trade secrets. Hoffmann also argues that, under Iowa law, the question of whether or not something is a trade secret depends, in part, upon whether a competitor *could* reverse engineer the product, not whether the competitor in fact did so.

## 2. Analysis

### a. Elements of misappropriation of "trade secrets"

IOWA CODE CHAPTER 550 is Iowa's version of the Uniform Trade Secrets Act.

"[S]ection 550.3(1) of the Iowa Code empowers a court to award an injunction for 'actual or threatened misappropriation of a trade secret.'" *Lemmon v. Hendrickson,* 559 N.W.2d 278, 279 (Iowa 1997) (quoting IOWA CODE § 550.3(1)). Similarly, "[s]ection 550.4(1) provides that 'an owner of a trade secret is entitled to recover damages for the misappropriation.'" *Economy Roofing & Insulating v. Zumaris,* 538 N.W.2d 641, 646 (Iowa 1995) (quoting § 550.4(1)). As the Iowa Supreme Court has explained, "There are three recognized prerequisites for relief based on the appropriation of a trade secret: (1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret." *Lemmon v. Hendrickson,* 559 N.W.2d 278, 279 (Iowa 1997). In the present motion for partial summary judgment, Hoffmann only challenges the first element, *i.e.,* the existence of trade secrets, as to any matters other than the "L & S leg" and the ABSS. Thus, the focus of the present discussion is the definition of a "trade secret" under Iowa law.

### b. Definition of a "trade secret"

IOWA CODE § 550.2(4) defines a trade secret as:

[I]nformation, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

IOWA CODE § 550.2(4); *see also Olson v. Nieman's, Ltd.,* 579 N.W.2d 299, 313 (Iowa

1998) (quoting this definition); *Economy Roofing,* 538 N.W.2d at 646 (same). As the Iowa Supreme Court has explained, "trade secrets" are broadly defined under Iowa law:

> In a recent case we gave a broad interpretation of "information" that could legally constitute "trade secrets":
>
>> Under the plain language of [IOWA CODE section 550.2(4)] "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. Business information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures. One commentator explains:
>>
>>> Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
>>
>> We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.
>>
>> *US West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) (citations omitted).

*Economy Roofing,* 538 N.W.2d at 646–47 (emphasis in original omitted). The Iowa Supreme Court has also explained that whether or not something is a "trade secret" is "a mixed question of law and fact." *Id.* at 649. The "legal part of the question" of whether or not something is a

"trade secret" is embodied in the first part of the statutory definition of "trade secret" in § 550.2(4), *i.e.,* " 'trade secret' means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process. . . ." *Id.* at 648 (quoting § 550.2(4)). On the other hand, "the fact part of the question arises from the remaining portion of the definition of trade secret in section 550.2(4)," *i.e.,* the requirements of subparagraphs *a* and *b. Id.* at 648–49. On a motion for summary judgment, of course, the court must determine whether or not the plaintiff has generated genuine issues of material fact on the "fact part of the question," before the existence of a trade secret becomes a question for the jury. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re TMJ Implants Prod. Liab. Litig.,* 113 F.3d at 1492.

### c. *"Reverse engineering"*

Hoffmann contends, *inter alia,* that the possibility of "reverse engineering" of Walker's designs is critical to a determination of whether or not they are "trade secrets." In *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751 (Iowa 1999), the Iowa Supreme Court explained that " '[r]everse engineering is the process by which a completed process [or device] is systematically broken down into its component parts to discover the properties of the product with the goal of gaining the expertise to reproduce the product.' " *Revere Transducers,* 595 N.W.2d at 775 n. 8 (quoting *Christianson v. Colt Indus. Operating Corp.,* 870 F.2d 1292, 1294 n. 4 (7th Cir. 1989)).

In *Revere Transducers,* the court also distinguished between the role of "reverse

engineering" in determining whether or not something is a "trade secret," and its role as a defense to liability on a claim of misappropriation of trade secrets. *See Revere Transducers*, 595 N.W.2d at 775–76. In *Revere Transducers*, the district court had instructed, in Instruction No. 18, that, as part of its determination of whether or not certain information constituted a "trade secret," the jury could consider, among other things, " '[t]he ease or difficulty with which the information could be properly acquired or duplicated by others.' " *Id.* at 775 (quoting the district court's jury instruction). However, the plaintiff asserted that "the district court erred in refusing to instruct the jury, as to the limited scope of a reverse engineering defense." More specifically,

> Revere asked the court to instruct the jury that "[t]he fact that one could have obtained a trade secret lawfully is not a defense if one does not actually use proper means to acquire the information." Revere's theory was that Deere could not avoid liability for misappropriation of Revere's trade secrets by asserting that the information was discoverable by reverse engineering or destructive testing because Deere offered no evidence at trial that it in fact used such methods.

*Id.* Thus, the plaintiff's contention in *Revere Transducers* was similar to Walker's contention here that Hoffmann cannot rely on the possibility of "reverse engineering" to determine the scope of Walker's trade secrets, when Hoffmann does not contend that it obtained in that fashion the matters that Walker contends are trade secrets. However, the Iowa Supreme Court concluded in *Revere Transducers* that the district court had properly rejected the plaintiff's requested instruction:

> We conclude that instruction No. 18 adequately stated the law. Instruction No. 18 is essentially a direct quote of Iowa Code section 550.2(4)(a) and (b).

Additionally, *Deere presented no evidence it performed reverse engineering and thus did not argue it had a defense to liability for misappropriation if the jury so found. Rather, Deere's contentions concerning reverse engineering went to the initial question of whether Revere's information related to hole size, hole placement, placement of gauges, production methods, and products costs constituted protectable trade secrets, a prerequisite to finding that Deere misappropriated Revere's trade secrets.* We believe that the question of whether Revere's alleged trade secrets could be discovered by alternative methods was adequately covered in Instruction No. 18 and we therefore find no error concerning the court's refusal to give Revere's requested jury instruction.

*Revere Transducers*, 595 N.W.2d at 775–76 (emphasis added). Thus, in light of *Revere Transducers*, (1) the possibility that certain matters can be discovered by "reverse engineering" is relevant to whether or not they are protectable trade secrets, and (2) Hoffmann may properly assert that certain matters are not "trade secrets," if they can be discovered by "reverse engineering," even if Hoffmann does not assert, as a defense to a claim of misappropriation of trade secrets, that it in fact obtained those matters by reverse engineering.

On the other hand, the Iowa Supreme Court's decision in *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299 (Iowa 1998), presents a somewhat different "spin" on the import of the possibility of "reverse engineering" of a purported trade secret. In that case, the defendant contended that the plaintiff's device did not obtain economic value from not being generally known, because the device could have been reverse engineered by competitors as soon as it was produced, and therefore it would not have remained secret. *Olson*, 579 N.W.2d at 314. However, focusing on the "economic

value" language of the definition of a "trade secret," the court noted that " '[e]conomic value' in section 550.2(4)(1) means 'value of the information to either the owner or a competitor; any information which protects the owner's competitive edge or advantage.' " *Olson*, 579 N.W.2d at 314 (quoting IOWA CODE § 550.2(4)(a), and *U.S. West Communications, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993)). Noting that the definition of a "trade secret" also considers its *potential* economic value, the court reasoned that, "[a]lthough Olson's device could be reverse engineered once placed on the market, this fact ignores substantial record evidence that Olson's device could have brought him economic value *before its release on the market.*" *Id.* (emphasis in the original). The court concluded that a jury could have found from the evidence that the plaintiff could have gained economic value from his invention, provided that he kept it secret, by selling it to a manufacturer for a flat fee or a royalty, or by patenting the device; that manufacturers were interested in his device; and that there was evidence that the idea was patentable before it was disclosed. *Id.* From this evidence, the court concluded that "[t]he jury could easily find that [the plaintiff's] idea had potential, independent economic value if it were kept secret until [the plaintiff] could exercise his several economic options," such that the "economic value" prong of the definition of a "trade secret" was satisfied, notwithstanding the possibility of reverse engineering. *Id.* Thus, in light of *Olson*, the critical import of "reverse engineering" is not simply whether a device *can be* "reverse engineered," standing alone, but whether or not, in light of the possibility of reverse engineering, the inventor has taken reasonable steps to keep the device secret *before* its release to the public. *Id.* In *Olson*, the court concluded that the inventor had generated a jury question on

"the reasonable-efforts-to-preserve-secrecy issue" by marking his drawings with the word "inventor," intending this marking as an appropriate legend of confidentiality, and because there was no evidence that a prospective buyer of the invention, who received drawings so marked, ever considered that the device disclosed in the drawings was *not* confidential. *Id.*

 Reading *Olson* and *Revere Transducers* together, this court concludes that a critical issue in determining the relevance of the possibility of "reverse engineering" to the question of whether or not something is a "trade secret" is whether or not the device or idea has been publicly disclosed, for example, by public sales of the device, *see Revere Transducers*, 595 N.W.2d at 775–76, or whether, instead, the inventor has taken reasonable steps to maintain the secrecy of the device, by patenting the device or filing a patent application, or disclosing the device only pursuant to a confidentiality agreement, even if the device would be readily susceptible to reverse engineering once released to the public. *See Olson*, 579 N.W.2d at 314. A reasonable reading of these cases, however, is that once a device has been publicly disclosed, for example, by public sales, the ease with which the device can be "reverse engineered" is certainly relevant to the question of whether or not the device *remains* a "trade secret." *See Revere Transducers*, 595 N.W.2d at 775–76, *and compare Olson*, 579 N.W.2d at 314.

#### d. *Walker's additional trade secrets*

In addition to the "L & S leg" and the ABSS—which Hoffmann apparently concedes Walker has adequately supported with record evidence to allow a jury to determine whether or not they are "trade secrets"—Walker contends that additional trade secrets upon which its misappropriation claim can be founded are all of the

engineering drawings that it provided to Hoffmann. Walker contends that it has identified these drawings with the requisite specificity in the course of discovery and that all of these drawings meet the definition of "trade secrets," regardless of whether some information contained in the drawings could have been discovered by reverse engineering. The court finds, however, that Walker has done little more than assert these positions; the court has looked, largely in vain, for affidavits, or "depositions, answers to interrogatories, and admissions on file," through which Walker has designated "specific facts showing that there is a genuine issue for trial" on the question of whether any additional drawings meet the definition of "trade secrets." *See* FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

The court does, indeed, find in the record a list of over 500 computer files containing engineering drawings and specifications that RJM/Walker provided to Hoffmann. As to the "legal part of the question" of whether or not these files are "trade secrets," based on the first part of the statutory definition of "trade secret" in § 550.2(4)—*i.e.,* " 'trade secret' means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process," *see* IOWA CODE § 550.2(4)—the court will assume, for the sake of argument, that the computer files are appropriate *kinds* of information to be "trade secrets." *See Economy Roofing,* 538 N.W.2d at 648.

However, Walker's contentions founder on "the fact part of the question [which] arises from the remaining portion of the definition of trade secret in section 550.2(4)," *i.e.,* the requirements of subparagraphs *a* and *b. Id.* at 648–49. Those requirements, again, are whether the purported trade secrets "[d]eriv[e] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from [their] disclosure or use," *and* "[are] the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." IOWA CODE § 550.2(4)(a) & (b).

The court will assume that each of the computer files identified by Walker as a "trade secret" is marked with an adequate notice of confidentiality, reasonable under the circumstances, to maintain its secrecy, thus satisfying the requirements of IOWA CODE § 550.2(4)(b). Certainly, if the confidentiality notice quoted in *Walker II* is typical of the confidentiality notices on these files,[4] that confidentiality notice is far more effective than the one found adequate in *Olson. See Olson,* 579 N.W.2d at 314 (the owner merely marked the drawings "inventor" as a legend of confidentiality, which the court found was adequate in light of evidence that a prospective buyer understood the intention to maintain confidentiality and had not disclosed the drawing to the public). Unlike the situation in *Olson,* however, the record evidence here is that RJM/Walker had made several public sales of sprayers, and Hoffmann con-

---

4. In *Walker II,* the court described the confidentiality notice as follows:

Each of the paper design drawings contained the following reservation of rights typed conspicuously on the face of the drawing, sometimes in multiple locations: RJ MANUFACTURING, INC. RESERVES PROPRIETARY RIGHTS TO THIS DRAWING AND THE DATA SHOWN THEREON; SAID DRAWING AND/OR DATA ARE CONFIDENTIAL AND ARE NOT TO BE USED OR REPRODUCED FOR ANY PURPOSE WITHOUT OUR PERMISSION.

*Walker II,* 220 F.Supp.2d at 1033.

tends, without adequate response from Walker to put the matter in dispute,[5] that these publicly sold sprayers incorporated the design features found in the drawings and computer files that Walker contends are "trade secrets." *Compare id.* (the court concluded that a jury could have found from the evidence that the plaintiff could have gained economic value from his invention, provided that he kept it secret, by selling it to a manufacturer for a flat fee or a royalty, or by patenting the device; that manufacturers were interested in his device; and that there was evidence that the idea was patentable before it was disclosed, all before the invention ever went into production). In such circumstances, it appears that whether or not the additional designs embodied in sprayers sold to the public remained "trade secrets" depends upon whether or not they were "readily ascertainable" upon entry of those sprayers into the public market, *see* IOWA CODE § 550.2(4)(a), and still more specifically, whether or not they could be readily ascertained by "reverse engineering." *Revere Transducers,* 595 N.W.2d at 775–76; *Olson,* 579 N.W.2d at 314. However, in the face of Hoffmann's expert's report that the designs in question were all readily ascertainable by reverse engineering, Walker offers only a denial, not contrary evidence sufficient to generate a genuine issue of material fact on the question. *See* FED. R. CIV. P. 56(e) (a party resisting summary judgment may not rest upon a denial, but must by affidavits, or "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *accord Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562;

*McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

Therefore, Hoffmann is entitled to summary judgment on Walker's claim of misappropriation of trade secrets to the extent that that claim is founded on alleged misappropriation of any "trade secrets" other than the "L & S leg" or the ABSS.

### G. Money Damages For Misappropriation Of Trade Secrets

#### 1. Arguments of the parties

■ Finally, Hoffmann contends that Walker is not entitled to money damages on its claim of misappropriation of trade secrets, because the court's issuance of a preliminary injunction eliminated Walker's entitlement to any damages. Hoffmann contends that the preliminary injunction shielded Walker from any potential harm from Hoffmann's purported misappropriation of trade secrets, making it inappropriate to award Walker any damages measured by "return on investment," "lost profits," "unjust enrichment," or "reasonable royalty." Hoffmann argues that reasonable return and lost profits are particularly inappropriate measures of damages here, because the injunction prevented any use, sale, or disclosure of Walker's alleged trade secrets, and Walker has identified no lost sales, so that the misappropriation could not have affected the value of Walker's investment or caused Walker to lose any profits. Hoffmann argues that the injunction likewise obviated any damages based on unjust enrichment or a reasonable royalty, because it deprived Hoffmann of any benefit of the purported misappropriation of trade secrets. In short, Hoffmann contends that Walker was "made

---

**5.** Walker disputes whether the "Walker sprayers" that RJM conveyed to Hoffmann in partial satisfaction of RJM's debt to Hoffmann incorporated all of the design features that Walker contends are trade secrets. However,

Walker makes no such argument regarding Hoffmann's contention that RJM/Walker had sold other sprayers to the public that incorporated the designs that Walker contends are trade secrets.

whole" by the preliminary injunction, so that no further relief, in the form of damages, is appropriate.

Walker, however, contends that money damages are still appropriate. Walker contends that it suffered damages in the form of the costs of pursuing a preliminary injunction and the diversion of its resources to the legal fight with Hoffmann at a critical time in its business development, which left it unable to repair relations with vendors, distributors, and customers, and robbed it of the cash flow necessary for production and marketing in the infancy of its business.[6] Walker also points out that Iowa law provides for measures of damages other than "lost profits." Specifically, Walker contends that IOWA CODE § 550.4 provides for a "reasonable royalty" method of determining damages, that such a method is based on a "hypothetical bargain" between a willing licensor and a willing licensee, and that such a method is appropriate in cases where the defendant has made no profit and the plaintiff is unable to establish a loss. The effect of the preliminary injunction, Walker argues, is irrelevant to the determination of a "reasonable royalty."

In reply, Hoffmann argues that Walker failed to resist its contentions that neither "reasonable return" nor "lost profits" damages are available in this case. Although Hoffmann admits that "unjust enrichment" damages, in the form of a "reasonable royalty," are theoretically available for misappropriation of trade secrets, Hoffmann contends that such damages are inappropriate here, because the trade secrets on which Walker bases its claim were never disclosed to the public prior to or following the issuance of a preliminary injunction. Hoffmann argues that a reasonable royalty is particularly appropriate only where a defendant has destroyed the value of the plaintiff's secrets through publication, but has not enjoyed any profits, and the plaintiff is hard-pressed to show any loss. The first condition, loss of value of the secrets through publication, is missing here, Hoffmann contends. Hoffmann also argues that Walker's reasonable royalty argument does not consider the effect of the preliminary injunction, which prevented any harm to Walker, so that a reasonable royalty would be duplicative relief.

### 2. Analysis

The court agrees with Hoffmann that Walker has not resisted that part of Hoffmann's motion for partial summary judgment that seeks summary judgment on any prayer for "reasonable return" or "lost profits" damages on the misappropriation of trade secrets claim. Therefore, the only measure of damages that is still at issue is damages for "unjust enrichment" in the form of a "reasonable royalty." Both parties focus their arguments concerning the availability of "reasonable royalty" damages on the discussion of such damages in *Olson v. Nieman's, Ltd.,* 579 N.W.2d 299 (Iowa 1998). Therefore, the court's analysis begins with the Iowa Supreme Court's decision in *Olson.*

### a. *Olson*

In *Olson,* the Iowa Supreme Court observed that "[c]ourts and commentators have noted that trade secret valuation is particularly difficult," and that various measures of damages had been applied in

---

**6.** Walker also contends that its claim for money damages is premised on more than just the misappropriation of trade secrets, but that argument is simply inapposite to Hoffmann's motion for partial summary judgment on the prayer for money damages *on the claim of misappropriation of trade secrets.* Walker must be able to prove damages proximately caused *by the conduct at issue in each claim* to recover *on that claim.*

such cases, among them, a "reasonable royalty," as "understood in patent cases." *Olson*, 579 N.W.2d at 309–10. The court also explained, "Reasonable royalty, as presently understood in patent cases, is 'simply that amount which the trier of facts estimates a person desiring to use a patent right would be willing to pay for its use and a patent owner desiring to license the patent would be willing to accept.'" *Id.* at 310 (quoting *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 537 n. 31 (5th Cir.1974)).

█ The court in *Olson* also considered damages based on a "reasonable royalty" in more detail for purposes of a claim of misappropriation of trade secrets, as follows:

> Determining a reasonable royalty is analogous to a jury's determination of a proper amount of damages for pain and suffering in a personal injury suit. Like reasonable royalties, pain and suffering cannot be measured by any exact mathematical formula. *Oldsen v. Jarvis*, 159 N.W.2d 431, 434 (Iowa 1968). Rather, pain and suffering rest in the sound discretion of the jury based upon a fair and impartial consideration of all the evidence. *Id.*
>
> Such flexibility in determining a reasonable royalty is imperative in cases involving business torts such as misappropriation of trade secrets. This is because "[p]ublic policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered." *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 385 N.E.2d 1349, 1356 (1979) (quoting 2 H. Nims, *Unfair Competition and Trade–Marks* § 419, at 1324–25 (4th ed.1947)). This is especially important where (1) a defendant has destroyed the value of plain-

tiff's secret through publication and has not enjoyed any profits and (2) the plaintiff is hard-pressed to show any loss. *University Computing Co.*, 504 F.2d at 535.

*Olson*, 579 N.W.2d at 310–11. Thus, Hoffmann is correct that the court in *Olson* noted that a reasonable royalty was "especially important" where the defendant has "destroyed the value of the plaintiff's trade secret through publication"—at least where the record also shows that "the defendant ... has not enjoyed any profits" and "the plaintiff is hard-pressed to show any loss." However, the court in *Olson* did not make destruction of the value of the plaintiff's trade secret through publication a *requirement* for application of a reasonable royalty measure of damages. Rather, in *Olson*, the court had previously quoted with approval a commentator's statement that "[i]t has been suggested that [a] reasonable royalty is a measure suitable only to cases where defendant has made no profit and plaintiff is unable to establish a loss." *Id.* at 310 (quoting Roger M. Milgrim, *Business Organizations: Milgrim on Trade Secrets* § 7.08[3][b], at 7–235 to 7–239). Thus, it appears that the trigger for a "reasonable royalty" measure of damages is (1) the absence of profit on the part of the defendant and (2) the absence of loss on the part of the plaintiff, although such a measure of damages may be "especially important" where it can *also* be shown that the defendant has destroyed the value of the plaintiff's secret through publication.

Here, Walker has asserted, and the record reasonably suggests, that the prerequisites for application of a "reasonable royalty" measure of damages under *Olson* are present in this case, *i.e.*, that Hoffmann has not enjoyed any profits and that Walker cannot show any loss. Thus, it appears that Walker has generated a genuine issue of material fact that a reasonable royalty is

an appropriate measure of damages in this case.

### b. *Winston Research Corp.*

Hoffmann, however, argues that a reasonable royalty is not appropriate here, because it would be duplicative of the relief already provided by the preliminary injunction, where the injunction deprived Hoffmann of any benefit it might have derived from the alleged improper use of Walker's trade secrets. Hoffmann relies primarily on the decision of the Ninth Circuit Court of Appeals in *Winston Research Corp. v. Minnesota Mining & Manufacturing Co.,* 350 F.2d 134 (9th Cir. 1965), in support of this contention. While the court does not disagree with the general proposition that injunctive relief may eliminate the need for monetary relief in certain cases, a close reading of *Winston,* particularly in light of *Olson,* reveals that this is not such a case.

In *Winston,* the Ninth Circuit Court of Appeals, *inter alia,* addressed the plaintiff's argument that the court "should have awarded money damages as well as injunctive relief," as follows:

> We think the district court acted well within its discretion in declining to do so. Since Winston sold none of its machines, it had no past profits to disgorge. The evidence as to possible future profits was at best highly speculative. To enjoin future sales and at the same time make an award based on future profits from the prohibited sales would result in duplicating and inconsistent relief, and the choice which the district court made between these mutually exclusive alternatives was not an unreasonable one. There was evidence that Winston would probably sell its machine and realize profits after the injunction expired, but these sales and profits, as we have seen, would not be tainted by breach of confidence, since Winston could by that time

have developed its machine from publicly disclosed information.

> We have examined the other bases upon which Mincom sought damages and are satisfied that they were either too remote and speculative, or that the injunction made Mincom as nearly whole as possible. Mincom argues that Winston gained a wide variety of advantages from the improper use of Mincom's trade secrets—such as obtaining financing for its development program, securing a government contract, shortening its development program, and reducing its development costs. There is an obvious difficulty in assigning a dollar value to such matters. The two-year injunction deprived Winston of any benefit it might have gained from these advantages and shielded Mincom from any potential harm from Winston's competition which these advantages may have rendered unfair. Mincom suggests that by hiring away Mincom's skilled employees Winston hindered Mincom's development program and increased its cost, but, as we have noted, the district court expressly considered this delay and extended the period of the injunction for an equivalent period.

*Winston,* 350 F.2d at 144. What becomes obvious from this quotation is that the court in *Winston* simply was not talking about injunctive relief duplicating or eliminating the need for a "reasonable royalty." In the first instance, the court only discussed the injunction as precluding an award of damages based on "lost profits," *see id.,* which is a measure of damages no longer at issue in this case, then in terms of damages for other "lost advantages," *see id.,* which do not appear ever to have been at issue here.

### c. *Application of cases*

Hoffmann may have an argument under *Winston* that the preliminary injunction

lasted long enough to deprive it of any benefit that it might have gained from misappropriating Walker's trade secrets and may have shielded Walker from any potential harm from Hoffmann's competition which misappropriation of Walker's trade secrets may have rendered unfair, *cf. Winston,* 350 F.2d at 144, but the record is a long way from establishing these facts as a matter of law. However, most importantly, nowhere in the quoted discussion from *Winston,* nor elsewhere in that decision that the court has found, is there an analysis of the effect of a preliminary injunction on damages based on a "reasonable royalty."

On the other hand, as the Iowa Supreme Court made clear in *Olson,* a "reasonable royalty" is an appropriate measure of damages where the defendant has made no profit and the plaintiff can show no loss, *see Olson,* 579 N.W.2d at 310–11, which is a circumstance that might obtain, for example, because the defendant was enjoined from using the misappropriated trade secrets before it could realize any profit on sales of products incorporating the misappropriated trade secrets. It should also be remembered that the preliminary injunction in this case has expired and that Walker concurred in the dismissal of its claim for permanent injunctive relief, on the ground that it could no longer be made whole by such relief. *See* § II.F., *supra.* In the present circumstances, it appears that a "reasonable royalty" is the *only* means of compensatory and prospective relief available, and that such relief is not duplicative of the past preliminary injunctive relief, even if the preliminary injunction forced Hoffmann to refrain from marketing its sprayer for some period of time as a means to protect Walker from the threat of immediate, irreparable harm.

▮ Therefore, although Hoffmann is entitled to summary judgment on Walker's prayer for any other damages (and its prayer for permanent injunctive relief, *see* § II.E., *supra* ) on Walker's claim of misappropriation of trade secrets, the court holds that damages based upon a "reasonable royalty" are available on a claim of misappropriation of trade secrets under Iowa law and that, at a minimum, Walker has generated a genuine issue of material fact that such damages are available in the circumstances presented here.

## III. CONCLUSION

Although the court's disposition of Hoffmann's second motion for partial summary judgment has not whittled down Walker's claims as much as Hoffmann might have hoped, Hoffmann is entitled to summary judgment in its favor on at least some of the issues presented in its motion. Those issues, however, do not include Hoffmann's contention that any "reverse palming off" in which it might have engaged, as claimed in Counts II, III, and V, was only *de minimis.* Nor do those issues include Hoffmann's contention that it did not engage in any conduct cognizable as "reverse palming off." However, Hoffmann is entitled to summary judgment in its favor on any prayer for money damages on the "reverse palming off" claim, because Walker has not generated a genuine issue of material fact that there was any "actual consumer confusion," which is a prerequisite to money damages on such a claim under the law of this circuit. Hoffmann is also entitled to summary judgment in its favor on Walker's prayer for permanent injunctive relief on *all* of Walker's claims, because Walker concedes that it can no longer be remedied by such relief. Hoffmann is also entitled to summary judgment in its favor on Walker's claim of misappropriation of trade secrets to the extent that the claim is based on any alleged trade secrets other than the "L & S leg" and the ABSS, because Walker has not generated any evidence to counter Hoffmann's contention that any other pur-

ported trade secrets were readily ascertainable by reverse engineering from sprayers that Walker had publicly sold. Finally, Hoffmann is entitled to summary judgment on Walker's prayer for money damages on its claim of misappropriation of trade secrets, with the exception of Walker's prayer for money damages based on a "reasonable royalty."

THEREFORE, defendant Hoffmann's *second* Motion For Partial Summary Judgment, filed on January 31, 2003 (docket no. 137), partially joined in by defendant J.R. Sales on February 27, 2003 (docket no. 155), is **granted in part and denied in part as set forth herein.**

IT IS SO ORDERED.